**WORTHEN BANK & TRUST COMPANY,**
Appellee,

v.

**NATIONAL BANKAMERICARD INCORPORATED,** Appellant.

No. 72–1555.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 14, 1973.

Decided Sept. 21, 1973.

*Rehearing and Rehearing En Banc*
Denied Oct. 24, 1973.

**120**

Francis R. Kirkham, San Francisco, Cal., for appellant.

Philip S. Anderson, Wright, Lindsey & Jennings, Little Rock, Ark., and Stephen D. Susman, Houston, Tex., for appellee.

Before GIBSON and ROSS, Circuit Judges, and BENSON, Chief District Judge.*

ROSS, Circuit Judge.

This is an appeal from an order granting partial summary judgment to the plaintiff in an antitrust action, based upon a holding by the trial court that the defendant had committed a "per se" violation of Section 1 of the Sherman Act. We reverse and remand for trial.

### I. *History*

#### A. Procedural Background

On November 26, 1971, the Worthen Bank & Trust Company (Worthen) filed its complaint on behalf of itself and a class of banks charging that National BankAmericard Incorporated (NBI) had adopted a bylaw, which if enforced would constitute a "group boycott" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Worthen sought damages and an injunction. NBI and Worthen entered into a stipulation that NBI would not enforce the bylaw pending determination of this litigation. On April 10, 1972, Worthen filed a motion for summary judgment. NBI filed affidavits in opposition. The motion was argued on June 20, 1972 and on July 19, 1972, the court held that enforcement of the bylaw would constitute a "group boycott" per se violative of Section 1 of the Sherman Act. Worthen Bank & Trust Co. v. National BankAmericard Inc., 345 F.Supp. 1309 (E.D.Ark.1972). On August 7, 1972, the court entered an order permanently enjoining NBI from enforcing bylaw 2.16.[1] Appeal from that order was taken pursuant to the provisions of 28 U.S.C. § 1292(a)(1).

#### B. Statement of Facts

##### 1. The parties [2]

###### a. NBI

NBI is a for profit, nonstock, membership corporation comprised of commercial banks and established to produce and promote bank credit cards. Membership in NBI is divided into two classes of banks which are denominated A and B banks. A banks issue cards, extend credit, and perform all functions necessary to maintain the system. A banks are liable for fees to defray the expense of NBI and are entitled to any rebates and dividends and govern NBI by membership on its board of directors and on advisory committees. B banks act only as agents for A banks. The B

---

* Paul Benson, Chief District Judge, District of North Dakota, sitting by designation.

1. The determination of damages was held in abeyance pending appeal. In addition, the court determined that the action was not properly maintained as a class suit. *See* Worthen Bank & Trust Co. v. National BankAmericard Inc., 345 F.Supp. 1323 (E.D.Ark. 1972).

2. After oral argument of this case it became apparent that any decision in this case would affect the bank credit card industry generally. Since the importance of the bank credit card industry to the general public was undisputed, the Court, on its own motion invited the United States to submit a brief as amicus curiae. *See* F.R.A.P. 29. The Department of Justice has filed a brief urging reversal.

bank status does not permit the bank to issue credit cards but does permit these banks to offer credit card service to merchant customers.[3] NBI is comprised of about 250 A banks and approximately 4,100 B banks.

b. Interbank/Master Charge

Interbank/Master Charge (MC), not a party to this suit, is a membership corporation which is comprised of regional banking associations and individual banks established to produce and promote bank credit card services. MC does not formally characterize its members by class, although it also has both card issuing and agent bank members, and is considered the larger of the two national bank credit card systems.

c. Worthen

Worthen is a bank incorporated and organized under the laws of Arkansas with its principal place of business in Little Rock, Arkansas. Worthen is an A bank in the NBI system, and is also an issuing bank of MC.

2. The bank credit card industry.

a. History

The national bank credit card industry has grown rapidly since its inception. By the end of 1971 the gross dollar volume in the industry exceeded eight billion dollars. NBI controlled some $3,370,000,000 and MC about $5,000,000,000. In every other respect, from cardholders to merchant outlets, MC was the larger system. NBI and MC are the only national bank credit card systems, although these bank credit cards compete with other types of cards such as regional bank cards, oil credit cards, and travel and entertainment cards.

b. The mechanics of the system.

For a national bank credit card system to operate four requirements must be met. First, there must be credit card issuing banks, tied together with other banks on a nation wide basis, willing to accept the commercial paper generated by the use of the card at points both near and distant to the card issuing bank. Second, merchants must be willing to accept the card in lieu of payment in currency. Third, there must be a process whereby a merchant can take the sales draft, generated by the use of the card, to a bank and have the paper purchased. The "merchant's" bank must then be able to transfer the paper to the card issuing bank. This process is called interchange. Finally, to insure the integrity of the system, there must be a process whereby the validity of the card and the availability of credit may be established prior to a purchase.

c. The potential for profit.

A banks may profit from a national credit card system by charging cardholders interest on accounts not paid in full on the first billing; by acquiring, at a discount, merchant's sales paper, and by increased merchant business through the satisfactory handling of a merchant's sales paper. B banks may earn revenues through discounts charged to the merchant and from "spill over" business resulting from its handling of the merchant's sales paper.

d. The importance of computer technology.

Both systems are actively engaged in improving authorization capabilities by increasing computer utilization. Thus:

"NBI is presently developing a computerized national authorization system. . . . NBI's initial intent is to develop a nationwide communications

---

3. According to the President of NBI:

"Class B banks act as agents for Class A banks and solicit and sign contracts with merchants for their sponsoring Class A banks, but do not issue cards or own cardholder accounts. They purchase sales drafts from merchants and forward them to their sponsoring Class A banks for processing, but do not otherwise partici-

pate in the interchange of such drafts. . . . The agent bank status permits smaller banks to offer credit card services to merchant customers, accepting their sales drafts but not carrying their outstanding credit, since they are reimbursed by their respective sponsoring Class A banks. . . . " App. 71.

system controlled by a central computer and several regional computers, which can be connected to electronically or optically engineered terminals in merchant or branch locations, capable of reading magnetically or optically encoded cards and providing virtually instantaneous communications for authorizations . . . ." App. 82–83. MC:

"recently formed a subsidiary called International Communication Systems, Inc., . . . . It is working on providing computer links so that computers in one city can interface with each other and directly authorize cardholder transactions. [MC] is constantly reviewing and trying to improve its interchange system, including its charge-back and clearing procedures." App. 99.

3. NBI's bylaw 2.16.

While NBI does *not* set uniform merchant discount rates, nor does it establish uniform interest rates, nor does it make exclusive territorial assignments, NBI *does* prohibit A banks, like the Worthen Bank, from joining the MC system, or any new national system, by penalty of loss of A status. The bylaw complained of in this suit provides in pertinent part as follows:

"Section 2.16. Requirements with Respect to other Credit Cards.

(a) No Class A member shall directly or indirectly (i) own, (ii) issue, (iii) assist in the issuance of (iv) service, (v) honor, or (vi) enter into contractual relationships with persons for the issuance of, or with merchants to honor, any Credit Cards except (1) as permitted pursuant to sections 2.04 and 2.05, (2) Area Credit Cards, and (3) Credit Cards owned or issued by any organization licensed to conduct the BankAmericard program in a foreign country.

(b) No Class A member shall directly or indirectly accept for deposit or purchase any instruments arising from the use of any Credit Cards except those arising from (i) Credit Cards issued pursuant to sections 2.04 and 2.05, (ii) Area Credit Cards, and (iii) Credit Cards owned or issued by any organization licensed to conduct the Bank-Americard program in a foreign country.

(c) No Class B member shall directly or indirectly (i) enter into contractual relationships with persons for the issuance of Credit Cards except as may be permitted by section 2.05 or (ii) own or issue in its own name Credit Cards, or (iii) appear on Credit Cards or elsewhere as the owner or issuer thereof, except Area Credit Cards.

(d) If a parent, subsidiary or affiliate of a member takes any action which the member may not take under the provisions of this section, such member shall be deemed thereby to have violated this section unless, in the case of affiliates, (i) there are no common officers or employees engaged in the management or operation of both BankAmericard and other Credit Card programs and (ii) the operations—including, without limitation, marketing, authorization, credit, collection and solicitation—of such programs are separate; provided that paragraph (c) shall not apply to parents, subsidiaries and affiliates which are Class A members. The provisions of section 2.15 shall apply, without limitation, to all officers and employees engaged in the operation of a member's Credit Card program and to all directors of members.

(e) The provisions of this section shall not apply during periods necessary to (i) convert a credit card program to or from the Bank-Americard program or (ii) make an adjustment to a Credit Card program as required for compliance with this section, provided such conversion or adjustment is completed in accordance with such conditions and in such time as the corporation

may require, which time shall not exceed twelve months from (1) the effective date of this section, (2) the date of acceptance of membership, (3) the date of delivery of notice of termination, or (4) the date of any future acquisition, merger or other circumstance which necessitates an adjustment hereunder, as the case may be.

(f) 'Credit Cards' as used in this section mean any instruments, whether in the form of a card, book, plate, coupon, or other credit device owned or issued by a bank (including any of its parents, subsidiaries or affiliates) which may be used to obtain money or to purchase or lease property or services on credit but do not include letters of credit or any such instruments usable exclusively for the obtaining of money from such bank or the guaranteeing of checks.

(g) 'Area Credit Cards' as used in this section mean any Credit Cards that are owned, issued, serviced, and honored exclusively by one bank and honored by merchants having a direct contractual relationship with such bank, except that such bank may appoint any other bank as its agent with respect to the Area Credit Card program for the sole purpose of accepting for deposit sales drafts from such merchants arising from the use of such Area Credit Cards." [4]

Bylaw 2.16 does not prevent class B membership in both systems and there are over 900 B banks in more than one system. Therefore a bank may participate in both NBI and MC activities as long as the bank does now own or issue, contract to issue, or appear as the owner or issuer of either bank card. Stated differently: (1) an A bank in the NBI system may not become an A bank or its equivalent in the MC system, (2) a B bank in the NBI system may not become an A bank or its equivalent in the MC system, (3) an A bank or its equivalent in the MC system may not become a B bank in the NBI system, (4) dual B membership in both NBI and MC is permissible.[5]

On the other hand, MC apparently does not prohibit dual membership. However, at least one member of MC is concerned with the problems of dual membership, as J. O. Elmer, Executive Vice President of the Wells Fargo Bank and participant in the formation of MC, stated by way of affidavit:

"If dual membership were allowed, it is not known whether banks would issue both cards. If a substantial number of major member banks in the Master Charge/Interbank System issued both Master Charge and Bank-Americard, however, there would be a reduced economic incentive to maintain two intercharge systems and competition between interchange systems would be reduced . . . ." App. 99.

4. Worthen's concessions for the purpose of summary judgment.

Worthen made the following concessions for the sole purpose of permitting

4. NBI bylaws 2.15 also provides:
"Section 2.15 Confidentiality. No member shall publish, disclose, convey or distribute to any person or organization, including, but not limited to, any parents, subsidiaries or affiliates, any confidential or proprietary matters of the corporation, including, but not limited to, documents, ideas, products and data, without the prior written consent of the corporation, except (a) to a person or organization which (i) is rendering services to such member with respect to its BankAmericard program and to the extent that such disclosure is necessary to properly perform such services, (ii) does not compete with the corporation or its members with respect to the BankAmericard program, and (iii) agrees to hold such matters in confidence; and (b) such matters that have been publicly released by the corporation."

5. Bylaw 2.16 also has an impact on local or regional bank credit card programs. Dual participation is apparently *prohibited* with respect to both A and B banks in NBI and any bank card program owned and operated by *more than one bank*.

the trial court to rule on its motion for summary judgment:

a. NBI acted in complete good faith and for legitimate business reasons, including the desire to preserve and foster competition between the two national credit card systems, when it passed bylaw 2.-16.

b. Bylaw 2.16 serves the legitimate business purposes of NBI and promotes competition between NBI and other national credit card systems.

c. In spite of bylaw 2.16 there will be vigorous competition in the bank card business.

d. Without bylaw 2.16 there will be substantial lessening of competition between the two national systems and an eventual merger of the two systems.

e. Worthen's real interest in challenging the bylaw was to acquire a monopoly in the bank card industry in Little Rock, Pulaski County, and Arkansas.

f. NBI's card cannot be produced by any single bank, and the production of the card requires the joint efforts of all banks within the system.

5. Summary of the district court holding.

The district court determined first that NBI was a horizontal combination of competitors based upon the rationale found in United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and United States v. Sealy, Inc., 388 U.S. 350, 87 S. Ct. 1847, 18 L.Ed.2d 1238 (1967). The court then went on to characterize bylaw 2.16 as threatening a group boycott per se violative of Section 1 of the Sherman Act. See e. g., Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). By characterizing the restraint as a per se violation the reasonableness question was foreclosed.

## II. *Section 1 of the Sherman Act*

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits agreements in restraint of trade. While not all agreements which restrain trade violate the Act, Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), those agreements which are unreasonable are violative of the Act. The Supreme Court has further declared that certain agreements are so consistently unreasonable that the question of reasonableness is foreclosed; that is, certain agreements are per se violative of the Act.

■ Among those types of agreements which have been classified as per se violations are those known roughly as "group boycotts". See e. g., Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). While no one definition of a "group boycott" is particularly suitable, the Fifth Circuit has suggested, in McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, 467 F.2d 178, 186–187 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973), that group boycotts generally involve either:

1. horizontal combinations among traders to exclude direct competitors from the market. See e. g., Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L. Ed. 1490 (1914), or,

2. vertical combinations to exclude competitors of some of the members of the combination. See e. g., Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), or,

3. combinations designed to influence the trade pratices of boycott victims rather than eliminate them as competitors. See e. g., Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, supra, 312 U.S. at 457, 61 S.Ct. 703, 85 L.Ed. 949.

The economic consequences of a "group boycott" are that distinct economic entities no longer maintain the independence which is essential for the functioning of a free market. *See* Barber, Refusals to Deal Under Federal Antitrust Law, 103 U.Pa.L.Rev. 847, 875–876(1955); Note, Concerted Refusals to Deal Under the Federal Antitrust Laws, 71 Harv.L.Rev. 1531, 1533 (1958).

The term "group boycott", as suggested above, is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the "group boycott" and "per se" labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed. While as a matter of broad classification these types of labels provide businessmen with intelligible and predictable guidelines for the conduct of business activity, *see* United States v. Topco Associates, Inc., 405 U.S. 596, 609 n. 10, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and while these labels obviate the tremendous burden trial courts must undertake when applying the rule of reason, *id.* at 609, 92 S.Ct. 1126, we emphasize that:

> " 'It should be plain why there is a real danger of the abuse of the per se principle by those predisposed to offer mechanical or dogmatic solutions to legal problems. In every antitrust case there are two routes to a finding of illegality: critically analyzing the competitive effects and possible justifications of the challenged practice; or subsuming it under one of the per se rules. The latter route is naturally the more tempting; it is easier to classify a practice in a forbidden category than to demonstrate from the ground up, as it were, why it is against public policy and should be forbidden.' " Elman, "Petrified Opinions" and Competitive Realities, 66 Col.L.Rev. 625, 627 (1966) *quoted in* Albrecht v. Herald Co., 390 U.S. 145, 170 n. 3, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (Stewart, J., dissenting).

## III. *Application of Section 1 to this case*

What we must do in this case is determine whether or not the trial court was correct in holding the bylaw to be a per se violation of Section 1 of the Sherman Act, or whether the bylaw should be tested at trial under the "rule of reason" enunciated in Standard Oil Co. v. United States, *supra,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619.

Before proceeding with this analysis it is important to summarize what the challenged bylaws do and do not do for the purpose of determining whether the motion for summary judgment should have been granted.

1. The NBI bylaws do prohibit its card issuing banks from being members of any other national credit card organization as either an issuing or an agent bank; and they likewise prohibit NBI's agent banks from being card issuing banks of MC. If enforced the bylaw would exclude Worthen from being a card issuing bank of both NBI and MC and it would have to choose between the two or become an agent or noncard issuing bank of both.

2. The NBI bylaws do not:
 a. allocate or assign exclusive territories to the member banks or restrict its membership in a way to limit competition on a geographic basis.
 b. attempt to fix the charges made for interest to the cardholders, the discounts charged the merchants or the interchange fee charged between issuing and agent banks.

 [In other words the elements of price control and exclusive territorial assignments are not present in this case.]

3. For the purpose of summary judgment Worthen has conceded that there is competition between the two national bank card systems which would be substantially less-

ened in absence of the bylaw, and there would be an eventual merger of the two systems if the bylaw is not enforced.

As indicated by the Department of Justice in its amicus brief:

"The question on appeal is whether the district court correctly held that by-law 2.16 is illegal *per se* under Section 1 of the Sherman Act. More precisely the question is whether it is illegal *per se* for a group of banks which are combined in a system to produce a product (or service) that individually none of them is able to produce, but which they sell in competition with each other, to exclude from proprietary membership in their group a bank which is participating in another such system."

In White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), the Supreme Court was faced with the propriety of granting summary judgment in a case involving franchising contracts between White and its dealer containing territorial sales restrictions. This was the first case to come before the Court involving vertically imposed territorial restrictions and it held that a "per se" determination should not have been made stating as follows:

"We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business . . . and within the 'rule of reason.' We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a 'pernicious effect on competition and lack . . . any redeeming virtue' and therefore should be classified as *per se* violations of the Sherman Act." *Id.* at 263, 83 S. Ct. at 702. (Citations omitted.)

The Antitrust Division of the Department of Justice has urged that this same reasoning should apply here:

"In this case the district court was faced with a novel and difficult issue of antitrust law. Its opinion reflects thoughtful and responsible consideration of that issue. Nevertheless, the very novelty and complexity of the questions indicate that they should have been resolved only after a full trial. Such a trial may establish that the result reached by the district court is correct, and that the restraints imposed by By-law 2.16 are not only more restrictive than necessary to achieve any legitimate purpose, but are, in addition, so harmful as to be illegal *per se*. On the other hand, a full record may show that the by-law is not only reasonable, but that it preserves competition between the several bank credit card systems."

We agree with that reasoning.

Worthen argues that the Supreme Court in *White* merely "wanted to know more about the competitive consequences of territorial and customer restrictions vertically imposed. It had never before held that such vertical restraints were *per se* illegal in *any* industry context." However our reading of *White* satisfies us that the novelty and importance of the question was the determining factor in applying the rule of reason rather than the fact that a vertical rather than a horizontal restraint was imposed.

Worthen further argues that the enforcement of the bylaw was properly held to be a per se violation, relying upon, among others, the following Supreme Court decisions: United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L. Ed.2d 741 (1959); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Fashion Origi-

nators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S. Ct. 703, 85 L.Ed. 949 (1941); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); United States v. Nationwide Trailer Rental Systems, Inc., 156 F.Supp. 800 (D.Kan.), aff'd per curiam, 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957). Our reading of those cases does not permit us to reach the same conclusion.

 These cases fall into three general categories. The first category may be referred to as group boycott cases. In Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), a combination of retail lumber dealers blacklisted wholesalers who sold directly to the retailers' customers. In Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), a large appliance dealer used its purchasing power to influence manufacturers and wholesalers to sell merchandise at discriminatory prices to a competing appliance dealer. In Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S. Ct. 703, 85 L.Ed. 949 (1941), a group of dress designers banded together and refused to sell their designs to stores which sold copies of their dresses. In these cases, and others, the Supreme Court attached the "group boycott" label and held the activities of the group to be per se violative of the Sherman Act. In each of these cases there was a lack of an economic justification, in terms of the need to join together to produce the product being sold. In this case, as conceded by Worthen, it would be impossible for any of the member banks, acting alone, to issue a national bank credit card. It can only be done by a nation-wide combination of banks. The facts that in this case there *is* an economic justification for the existence of NBI in terms of productive capacity, and inferentially a justification for preserving the integrity of that productive capacity, together with the fact that in the cited cases there was a lack of *any* redeeming virtue,[6] leads us to the conclusion that these cases are not controlling here. *See* Note, Concerted Refusals to Deal under the Federal Antitrust Laws, *supra,* 71 Harv.L.Rev. at 1536–1541.

The second line of cases suggested by Worthen are territorial restrictions or price restraint cases. United States v. Topco Associates, Inc., *supra,* 405 U.S. at 596, 92 S.Ct. 1126, involved a cooperative association of small and medium sized supermarket chains. Each chain was run independently and no grocery business was conducted under the Topco name. Topco's function was to serve as a purchasing agent, procuring and distributing food and related nonfood items, most of which were sold under a brand name owned by the association. This program allowed each member to save costs, thus enhancing the competitive position of the member with respect to large competitors. Each member of Topco was allocated an exclusive area in which to sell the Topco product. The procedure for approval of new members gave existing members a "veto of sorts" over actual or potential competitors in the area. Topco also prohibited the resale of goods at wholesale prices. Applying the rule of reason the district court upheld these restrictions. However, the Supreme Court struck down the territorial allocation system and the other restriction as per se violations of the Sherman Act. The Court did this in the face of Topco's arguments that without exclusive territorial allocations no member would have the incentive to ad-

---

6. Per se violations include those "'agreements or practices which because of their pernicious effect on competition *and lack of any redeeming virtue* are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" Northern Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) *quoted* in White Motor Co. v. United States, *supra,* 372 U.S. at 262, 83 S.Ct. at 701. (Emphasis supplied.)

vertise the Topco brand, and that without this device such chains as A & P would be able to establish a monopoly position in the market.

We first note that even under the rule of reason analysis suggested by Topco that its claim was open to serious question.[7] *See* Supreme Court Review, 1971 Term, 86 Harv.L.Rev. 1, 245 (1972). But in any event, it is clear that the essential restraint in the *Topco* case involved an agreement between members not to compete with each other and to refuse to sell at wholesale. On this record, these conclusions cannot be drawn in this case.

United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), was the touchstone for the *Topco* decision. Sealy was the owner of a trademark for Sealy brand mattresses. It licensed manufacturers in various parts of the country to produce and sell the Sealy trademarked mattresses and allocated territories for each licensee. Sealy agreed with each licensee not to license anyone else to manufacture or sell the Sealy product in a designated area and the licensee agreed not to manufacture or sell the Sealy product outside the area. The licensees owned most of the Sealy stock and controlled the day to day activities of Sealy. Sealy was charged with conspiracy to allocate territories and to fix prices. The district court enjoined the price fixing provisions, but upheld the territorial allocation system. The Court reversed, holding that since Sealy was owned by its licensees the territorial allocation system was a horizontal restraint of trade and therefore the system was a per se violation of Section 1. *Sealy*, like *Topco*, presented agreements among members not to compete

with each other, and no independent economic justification for the group could be found since the individual members were obviously able to produce the product absent the association.

Here, we do not feel that the *Topco* and *Sealy* cases are controlling since completely different types of restraints were present in those cases involving exclusive territorial assignments and price restraints, and since the association of the members was *not* required by industry stucture in terms of the ability to produce the product as is the case here.

We turn finally to the last line of cases relied upon by Worthen. Associated Press v. United States, 326 U.S. 1, 65 S. Ct. 1416, 89 L.Ed. 2013 (1945), involved the legality of the bylaws of the Associated Press which placed restrictions on the admission to membership of applicants serving the same area as any existing member, and other bylaws forbidding A.P. members to sell local news to nonmembers. The Court, in group boycott language, struck down the bylaws of A.P. which restricted membership solely because the applicant was a competitor of an existing member. With regard to the other bylaw, however, forbidding A. P. members to sell local news to nonmembers, an excellent example of a concerted refusal to deal, the Supreme Court did not strike down that prohibition. *Id.* at 21–22, 65 S.Ct. 1416. *See also* Bird, Sherman Act Limitations on Noncommercial Refusals to Deal, 1970 DukeL.J. 247, 289–290 & n. 168 (1970); Note, Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason, 66 Col.L.Rev. 1487, 1502 (1966); Barber, Refusals to Deal Under Federal Antitrust Law, *supra*, 103 U. Pa.L.Rev. at 878–879.

7. As Chief Justice Burger noted in his dissent, United States v. Topco Associates, Inc., *supra*, 405 U.S. at 614, 92 S.Ct. 1126, the Topco arrangement provided its members with certain economies which they could not otherwise achieve except by association. But we agree with the Justice Department that "[T]he 'product' represented by a national credit card requires cooperative relationships among the member banks of a kind not encountered in the sale of products by individual supermarket chains." Indeed in this case association is required before the "product" can exist.

As a consequence we must conclude that *Associated Press* does not mandate the application of the per se principle in this case. Unlike the *Associated Press* case this record does not present any indication that restrictions on membership are imposed to enable member banks to be free from competition from other competing banks. In fact it appears that competing banks in the same city are admitted to membership in NBI. The bylaw in question here is most similar to the restriction in *Associated Press* preventing the sale of local news to nonmembers, and, as we have discussed, this restriction was not held to be per se unlawful standing alone.

Another case relied upon by Worthen is perhaps the closest on point yet the least illuminating. United States v. Nationwide Trailer Rental Systems, Inc., 156 F.Supp. 800 (D.Kan.), aff'd per curiam, 355 U.S. 10, 78 S.Ct. 11, 2 L. Ed.2d 20 (1957). *Nationwide Trailer* involved a membership corporation designed to provide a network of stations from which trailers could be rented and to which they could be returned after use. At issue were price fixing provisions, territorial allocation provisions, and a provision preventing a member from being connected with a competitive trailer system. The district court enjoined these provisions.

While we believe that the *Nationwide Trailer* case has obvious similarities to this one, two factors suggest that reliance would be misplaced. First, the *Nationwide Trailer* opinion like many of the others relied upon by Worthen, involved an aggregate of trade restraints; that is, not only was the dual membership provision at issue, but price fixing and territorial allocations were also involved. Perhaps more importantly, the

opinion is based upon a bare set of findings of fact and conclusions of law, thus the legal reasoning for enjoining the provision preventing dual membership is not clear.

In this case, because of the abbreviated record consisting primarily of affidavits and admissions, we do not know exactly how NBI competes with MC on a system level or how the individual member banks compete with each other. There is not a sufficient basis in the record to determine how the proposed rule would affect competition between NBI and MC, if indeed, there is direct competition between the two;[8] or how it would affect competition between member banks in the same geographical area; or how it would affect the overall interest cost to the credit card holders and the discount cost to the merchants from which the banks purchase the paper. There is some indication that dual representation of both NBI and MC would result in the pirating of technological information relating to instantaneous computer verification of credit cards but there is no showing exactly how this might affect NBI and MC or its members.[9] The admission, for the purposes of ruling on the motion for summary judgment, that the enforcement of the rule would result in an eventual merger of NBI and MC is of little use since such a merger would in itself possibly constitute a violation of the antitrust laws; and the admission that there is competition between the systems which will be diminished if the rule is not enforced may or may not be correct.

The bank card industry is a relatively new one and, with over eight billion dollars in annual business, a very large and

---

8. It should be noted that the determination of whether there is competition between NBI and MC does not depend upon actual revenue competition between them. Competition may be shown by proving an overall increase in the profit making ability of their members.

9. Of special significance in this respect would be evidence as to how the development of these new technological procedures would permit better and cheaper service to the card holders and the merchants or otherwise enhance competition between the systems and their member banks.

important segment of our economy. Considering the importance of the industry and the lack of definitive information relating to competition therein, it would be a mistake to determine this case of first impression on a per se basis. This is especially true where it may result in the dilution of competition or the elimination of one of the two competitors, where this is not an aggregate of illegal restraints such as price fixing or exclusive territorial allocations and where the initial purpose in forming the joint venture, to produce a national credit card, is obviously not illegal.

There is an additional reason that this case should be tried on its merits. If it is shown during the trial that some restriction on dual membership is permissible, the trial court must determine in its decree whether or not the bylaw as drafted goes too far. Possibly the ban against an agent bank of NBI acting as an issuing bank of any other group, (and visa versa) goes further than it needs to go to accomplish its legitimate purposes; and possibly the extension of this ban to membership in new national credit card systems is neither necessary nor proper.[10]

These are all matters for the trial court to consider in determining first whether any restriction should be permitted and secondly the extent of that restriction.[11] The summary judgment is hereby reversed and the case is remanded for trial.

---

10. The question is whether the means used by NBI to protect its productive capacity goes further than necessary in restricting the free choice of its members. *Cf.* Silver v. New York Stock Exchange, 373 U.S. 341, 361-366, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Note, Concerted Refusals to Deal Under the Federal Antitrust Laws, *supra*, 71 Harv.L.Rev. at 1537.

11. It is incumbent upon plaintiff to prove the effect of the rule on inter-bank competition, and especially the effect on interest rates on deferred payments charged the cardholder, the discount rates charged the merchants and spill over business. If plaintiff proves that the bylaw restrains interbank competition then NBI must prove that competition does exist between the systems and the effect of the bylaw thereon with emphasis on the possible reduction of incentive in advancing technological innovations, on resulting interest costs to the cardholders and discount rates to the merchants. NBI must also submit proof as to the necessity of maintaining the bylaw in its present form rather than a more limited version thereof.