John PENNE and Penne Realty, Inc., a Minnesota Corporation, Appellants,

v.

The GREATER MINNEAPOLIS AREA BOARD OF REALTORS, Appellee.

No. 78–1776.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1979.

Decided Sept. 5, 1979.

Rehearing and Rehearing En Banc Denied Sept. 28, 1979.

---

David Essling, Johnson, Essling, Williams, Essling & Daly, St. Paul, Minn., for appellants.

James R. Safley (on brief), Robins, Davis & Lyons, Minneapolis, Minn., argued; and Barry G. Reed, Minneapolis, Minn., on brief, for appellee.

Before GIBSON, Chief Judge, HENLEY, Circuit Judge, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

Appellants brought this private antitrust action under 28 U.S.C. § 1337 and Sections 4, 12 and 16 of the Clayton Act against the Greater Minneapolis Area Board of Realtors (the Board) and 19 of its member firms, alleging that the defendants had contracted, combined or conspired to fix and maintain brokerage fees charged in connection with the sale of real property, in violation of Section 1 of the Sherman Act and certain Minnesota statutes.[1] The district court[2] granted the Board's motion for summary judgment and directed entry of final judgment in its favor pursuant to Rules 56 and 54(b), F.R.Civ.P. The only question presented on this appeal is whether the record presents a genuine issue of material fact concerning involvement of the Board in an alleged combination or conspiracy to fix and maintain brokerage fees. Because we conclude that it does, we reverse.

## I.

Penne Realty and all defendants except the Board are real estate brokerage firms. John Penne is president of Penne Realty. (Penne Realty and Penne will be referred to herein collectively as "Penne.") The brokerage firms are in the business of bringing sellers and buyers of real estate together. The firms compete both for sellers, or "listings," and for sales. People with real estate for sale sign listing agreements with individual firms that bind the seller, among other things, to pay a commission to the listing firm when the property is sold. This commission is normally some percentage of the selling price, agreed upon between the seller and the firm with which the property is listed. Penne offers its customers rates of 4% or 5%; the defendant firms offer their customers rates of 6% or 7%. There is thus competition on the basis of price for sellers (listings) between Penne and the defendant firms.

The Board is a trade association that promulgates and enforces rules and regulations governing its members and provides them with various professional, educational and social services. Penne Realty and all the defendant firms are members of the Board. The directors and many of the officers of the Board are drawn from persons engaged in the real estate business; during the last six years many of these have been persons employed by firms that are defendants in this case. Members of the Board are required to submit disputes between themselves to the Board's Ethics and Arbitration Committee. This committee is also composed of persons who are members of the Board.

The most important professional service the Board offers its members is its Multiple Listing Service (MLS), in which about 400 firms participate, including Penne Realty and all of the defendant firms. The MLS is a cooperative selling service that works as follows. When a participating firm secures the right to sell a property (a listing), it normally must file the listing agreement with the MLS, along with a "listing circular" containing information about the listed property. The MLS distributes these listing circulars to other participating firms, all of which may then try to find a buyer for the listed property. Under Minnesota law only the MLS member with which the seller has listed the property is entitled to be paid the commission for its sale. If the listing firm itself finds the buyer, it keeps the entire commission. If another broker finds the buyer, the sale is called "cooperative," and the listing broker divides the commis-

---

* The Honorable William C. Hanson, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

1. Minn. Stats. Sections 325.81, subd. 1, and its successor statutes, Minn. Stats. Sections 325.-8013 and 325.8015.

2. The Honorable Earl R. Larson, Senior United States District Judge, District of Minnesota.

sion with the broker that has found the buyer. The Board's MLS is the only such service in the Minneapolis area, and there is evidence that participation in it is necessary for a brokerage firm to compete effectively with other firms. The workings of the MLS are at the heart of this lawsuit.

One main problem comes in deciding how to divide the commission on a cooperative sale. This problem is not so severe when all firms charge at the same rate for their services. This evidently was the case in Minneapolis prior to 1969 or 1970, when virtually all firms charged 6%, and the Board required that the commission be divided 50/50 between listing and selling firms. In 1972 the Board withdrew that requirement, and it appears that at present the most usual division between firms charging at the same rate has shifted to 55/45 in favor of the listing firm.

However, when firms charge different percentages of the selling price as their commission—that is, when they compete for listings on the basis of price—the following problem arises. Suppose that firm A charges 4% and firm B charges 7%, and that A and B divide commissions on cooperative sales on a straight 55/45 basis. Then if A sells a B listing for $100,000, A earns 45% of the $7,000 B collects as its fee, or $3,150. But if B sells an A listing for $100,000, B only earns 45% of the $4,000 that A collects as its fee, or $1,800. Quite aside from the different incentives and disincentives this creates, B may think the arrangement unfair, since A, the cut-rate broker, appears to have the best of both worlds: because of its lower fee, A has an advantage in the competition for listings; and yet A benefits from B's higher fee whenever it sells one of B's listings. For these and perhaps other reasons, B might seek to alter its fee-splitting arrangement with A as follows: Instead of dividing its full 7% commission with A when A sells one of its listings, B

*will divide only so much of the commission with A as A would have collected had A listed the property and charged its usual fee.* Thus, if A now sells a B listing for $100,000, A only earns 45% of $4,000, or $1,800—the same as B would earn if it sold A's listing for $100,000. This not only prevents A from benefiting from B's higher fee when A sells a B listing, but it actually benefits B. For whereas under the old arrangement B only kept $3,850, or 55% of its $7,000 commission when A sold its listing, B *now* keeps $4,200 or 74.3% of the fee. What B loses in listings to A's price competition it may gain back from A's zeal to sell houses. And now, of course, it will be A who will feel it is being treated unfairly, since when A and B cooperate on a sale of one of B's listings, the division of the commission is almost 75/25 in favor of B, whereas when they cooperate on a sale of one of A's listings the division is only 55/45 in favor of A. Penne, who takes the part of the cut-rate broker A, refers to this latter method of dividing fees on cooperative sales as "punitive," thereby suggesting that the higher-priced firms that divide their fees with it on this basis are punishing it for its lower rates.

Until 1969 or 1970, the Board recommended that its members charge 6% on most listings.[3] When this recommended fee schedule was eliminated, some members began charging 7%. These firms did not wish to split their fees on a straight 50/50 or 55/45 basis with the firms charging less than they, as above. In January 1971 the Board adopted the following rule:

> On a cooperative sale the listing firm shall divide half the gross brokerage fee received with the selling firm, after payment of the Multiple Listing fee. Listing firm shall, however, have the right to base the division of fees on the brokerage fee the selling firm regularly charges on sales of similar type properties.

---

3. This recommendation was enforced by the Board through a rule providing that a member firm could submit a listing at less than 6% only if it "agreed" to pay the selling firm 50% of a

6% commission. This variant of the "punitive split" discussed above was apparently also dropped in 1969 or 1970.

This rule gave the "punitive split"[4] of commissions the sanction of the Board.

At about the same time that commission rates began to vary and "punitive splits" received the sanction of the Board, the Board also began to print a roman numeral in a special place on the MLS listing circulars it distributed to each MLS participant on every listed property. This roman numeral indicated the commission rate at which the listing firm was charging the seller on that listing. Thus, the circulars on Penne's listings would ordinarily have a "IV" or "V" in one corner; other firms would have a "VI" or "VII". The reason given for the institution of this form of interseller price information exchange was that each firm was entitled to know what fee it would divide with the listing firm on a cooperative sale of the given listed property.

In 1972 the Board retracted all written rules concerning the division of commissions on cooperative sales. It is clearly established in the record that since that time the Board has frequently made public pronouncements dissociating itself from both the setting of commission rates and the division of commissions on cooperative sales, and informing its member firms that they are to individually determine their commissions and the division of commission they will offer on cooperative sales. Penne has offered no evidence that since 1972 the Board has made recommendations to any of its member firms regarding the division of commissions. However, the Board has continued to print roman numerals on the MLS listing circulars, indicating the commission rate at which the listing firm is charging the seller on the listed property.[5] Furthermore, the "punitive split" has continued even without the official sanction of the Board. In December 1973, soon after Pen-

ne applied for admission to the Board, one of Minneapolis' largest real estate brokerage firms, Edina Realty, caused a letter to be distributed to all member firms of the MLS, announcing that it would impose "punitive" divisions of commissions on cooperative sales on firms charging less than 7%. Edina stated that it would divide commissions on cooperative sales of its listings on the basis of the lowest fee offered to the general public by the selling firm. During the next few months many other firms publicly followed suit, and all of the defendant firms in this case have allegedly divided commissions with Penne on such a "punitive" basis.

## II.

The crux of Penne's charges against all the defendants is that they have combined or conspired to fix and maintain brokerage fees by the use of essentially three devices: imposing "punitive" divisions of commissions on cooperative sales upon brokers who charge lower rates; "blacklisting" brokers who charge lower rates by refusing to cooperate in the sale of their listings; and making deprecatory statements about brokers who charge lower rates to their customers and potential customers. Penne alleges that all of these devices have been used against it in particular. The Board is said to be the "vehicle" of the alleged conspiracy. Its involvement is predicated mainly on its dissemination of its member firms' price information, usually by publication of the information on the MLS listing circulars, but sometimes through other means (*see* n.5 *supra*).

That the Board's dissemination of this information is a form of interseller price verification there can be no doubt: specific firms are identified as selling spe-

---

4. By using this term we mean to imply no opinion as to the legality or illegality of the practice referred to.

5. We note that listing firms are not required to have the commission rate information printed on the listing circulars. However, if the infor-

mation is not supplied on a given circular, it can be obtained simply by calling the MLS and asking what the commission rate is on the listing in question. Apparently most firms, including Penne, have the information printed most of the time.

cific services to specific customers at specific prices, all in advance of the sale. Such information exchanges are not *per se* violations of Section 1 of the Sherman Act, *United States v. Citizens and Southern National Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975); *United States v. Container Corp.*, 393 U.S. 333, 339, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) (concurring opinion); the Supreme Court has recognized that they can serve to render the conduct of commercial affairs "more intelligent through the free distribution of knowledge of all the essential factors entering into the commercial transaction[,]" and that "[i]t was not the purpose or the intent of the Sherman Anti-Trust Law to inhibit the intelligent conduct of business operations[.]" *Maple Flooring Mfg. Assn. v. United States*, 268 U.S. 563, 583, 45 S.Ct. 578, 585, 69 L.Ed. 1093 (1925).

However, such information exchanges are not necessarily or *per se legal* either; their legality under the antitrust laws depends specifically on their effect upon competition. *See United States v. Container Corp.*, *supra*, 393 U.S. at 337, 89 S.Ct. 510; *Maple Flooring Mfg. Assn. v. United States*, *supra*, 268 U.S. at 585, 45 S.Ct. 578. In particular, as the Supreme Court recently reiterated, the exchange of price information among competitors carries with it the potential "for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions." *United States v. United States Gypsum Co.*, 438 U.S. 422, 457, 98 S.Ct. 2864, 2884, 57 L.Ed.2d 854 (1978). It is the development of precisely such a price-fixing arrangement that Penne alleges in this case.

 We think that on the question of the role in this alleged conspiracy of the price information exchange fostered by the Board, "it is [not] quite clear what the truth is, . . . [or that] no genuine issue remains for trial," *Sartor v. Arkansas Natural Gas. Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944), *quoted in Poller v. Columbia Broadcasting System*,

368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and hence that summary judgment was improper in this case. We are guided by the rule that

> [i]n passing upon a motion for summary judgment the court is required to view the facts in the light most favorable to the party opposing the motion and to give to that party the benefit of reasonable inferences to be drawn from underlying facts[,]

and that

> summary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances.

*See Unlaub Co., Inc. v. Sexton*, 568 F.2d 72, 76 (8th Cir. 1977); *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209–10 (8th Cir. 1976). The Board simply has not demonstrated that Penne is not entitled to recover against it under any discernible circumstances. On the contrary, upon the record as it now stands, it remains an open question whether the price information exchange "has had an anti-competitive effect in the industry, chilling the vigor of [Penne's] price competition." *United States v. Container Corp.*, *supra* 393 U.S. at 337, 89 S.Ct. at 512. The record presents at least the following factual issues relating to this question:

1. *"Punitive Splits."* There is evidence that some of Penne's competitors have adopted the practice of dividing commissions with Penne and other cut-rate firms on a "punitive" basis. Penne alleges not only that this practice is employed pursuant to a conspiracy to fix brokerage fees, but also that the Board's dissemination of commission rate information on its MLS listing circulars and otherwise facilitates the practice. Admittedly the summary judgment record contains little evidence that shows *how* the price information exchange facilitates the practice of the "punitive split;"[6]

---

6. This would involve a fuller exploration of how the defendant firms implement the practice than is presented in the record before us.

however, we believe there is sufficient evidence to raise genuine issues about the connection between the two. Among other things there is the historical fact that the dissemination of the price information began at about the same time that the "punitive split" was officially sanctioned by the Board; and Penne's analysis of the alleged legitimate business purpose of the dissemination of the information, which suggests that at best only the "high-priced" firms benefit by it. Penne should be allowed to make its argument to a fact finder after a full exploration of the connections between the Board and the alleged conspiracy to fix brokerage fees. We believe that if Penne can prove a conspiracy to fix prices through the use of the "punitive split," a fact finder might find that the price information exchange fostered by the Board is implicated in the conspiracy. At the very least, nothing in the record forecloses such a finding.

2. *"Blacklisting."* There is evidence that some of Penne's competitors have refused to cooperate with Penne on the sale of its listings, or at least on the sale of those of its listings on which it was charging only a 4% or 5% commission. Such refusals to deal, if proven and proven to have been undertaken pursuant to a conspiracy to stifle Penne's price competition, could well constitute violations of Section 1 of the Sherman Act. *See Worthen Bank and Trust Co. v. National Bank Americard Inc.*, 485 F.2d 119 (8th Cir. 1973). The record presents a genuine issue of fact relating to the role played by the Board's dissemination of Penne's commission rates on specific listed properties in the alleged conspiracy to "blacklist" Penne's low-commission listings.

3. *"Deprecatory statements" to Penne customers.* There is evidence that some of Penne's competitors have approached persons who have listed their properties with Penne at 4% or 5%, and have told them that Penne listings would not sell; that other brokers would not show the properties be-cause of the low commission rate; and that the persons should cancel their agreements with Penne and list with a different firm. Such activity might be found to have both the purpose and effect of "chilling the vigor of Penne's price competition" in violation of Section I of the Sherman Act. The record presents genuine issues of fact relating to the role played by the Board's dissemination of Penne's commission rates on specific listed properties, both in enabling Penne's competitors to identify customers whom Penne is charging only 4% or 5%, and in aiding Penne's competitors in making their alleged deprecatory statements.[7]

### III.

The Board makes three arguments for its claim that its dissemination of commission rate information on its MLS listing circulars and otherwise raises no genuine issues of material fact about its involvement in the alleged conspiracy of the other defendants. One is that there is a legitimate business reason for the practice, since "[k]nowlege of the brokerage fee which the owner has agreed to pay the listing broker is . . . a matter of legitimate concern to such [potentially cooperative] selling broker." However, even aside from Penne's analysis suggesting that only the "high-priced" firms benefit from the dissemination of the price information by the Board, the law is settled that

> [t]he antitrust outcome does not turn merely on the presence of sound business reason or motive. . . . Our inquiry is whether, assuming nonpredatory motives and business purposes . . ., the effect upon competition in the marketplace is substantially adverse. The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct. It is only if the conduct is not unlawful in its impact in the marketplace or if the self-interest coincides with the statutory concern with

---

7. There is evidence that some of Penne's competitors have shown Penne customers the listing circulars on their properties, pointed to the roman numeral indicating the commission rate, explained what it meant, and then gone from there to explain why other brokers would allegedly not show or sell Penne listings.

the preservation and promotion of competition that protection is achieved. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

*United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 1863, 1864, 18 L.Ed.2d 1249 (1967).[8]

The Board also argues that "dissemination of Penne commission charges on MLS listings cannot possibly result in damage or injury to [Penne] as their commission charges are heavily advertised and intended by [them] to be of common knowledge in the real estate industry." It is clear from the record that Penne does advertise its fees widely, even in Board publications specifically intended for consumption by those involved in the real estate business. However, as we have indicated, we believe that there are genuine issues specifically about the illegitimate use by Penne's competitors of the commission rate information disseminated by the Board. There are therefore genuine issues of fact relating to damage or injury to Penne as a result of the Board's dissemination of the information, even taking Penne's own advertisement of its rate structure into consideration.

Finally, the Board points out that under the terms of an injunction entered as part of the settlement of a previous antitrust suit in which it was involved, it was expressly permitted to disseminate commission rate information. *See Edward C. Forbes, et al. v. Greater Minneapolis Area Board of Realtors, et al.*, No. 4–72 Civil 569 (D.Minn. August 29, 1975) (unpublished). The pertinent language of the injunction is as follows:

VIII. Nothing in this Injunction shall be deemed to prohibit circulation by the Board's multiple listing services of information, in connection with bona fide efforts to sell real property, concerning the commission which a broker has agreed upon with his clients, or the percentage division thereof which a listing broker has agreed to pay a selling broker, arrived at in accordance with this Injunction.

The Board also notes that the circulation of commission rate information has been permitted by other courts in cases involving real estate boards and multiple listing services.[9]

The short answer to this argument is that nothing in the *Forbes* injunction or the other cases cited by the Board can be construed to countenance the sort of dissemination of price information as is here involved if such dissemination is shown to have anticompetitive effects forbidden under the Sherman Act. We hold only that the record in this case presents fact questions on this latter issue that cannot be resolved on a motion for summary judgment.

### IV.

In view of the foregoing, we need not consider in detail Penne's other allegations against the Board. If proven, they would tend to implicate the Board more closely in the "punitive split" policies of the defendant firms than the mere price information exchange discussed above might do,[10] and would raise questions about the intent behind and reasonableness of a certain adver-

**8.** Insofar as *Schwinn* held that certain vertical territorial restraints were illegal *per se*, it was of course overruled by *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). However, the principles quoted above from *Schwinn* were not affected by *G.T.E. Sylvania. See Hecht v. Pro-Football, Inc.*, 187 U.S.App.D.C. 73, 87 n. 67, 570 F.2d 982, 996 n. 67 (D.C.Cir. 1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121.

**9.** *See Murphy v. Alpha Realty, Inc.*, 1978–2 Trade Cases ¶ 62,388 (N.D.Ill.1978); *Hill v. Art Rice Realty Co.*, 1974–2 Trade Cases ¶ 75,364

(D.Ala.1974); *U. S. v. Greater Pittsburgh Board of Realtors*, 1973–1 Trade Cases ¶ 74,454 (W.D. Pa.1973); *U. S. v. Los Angeles Realty Board*, 1973–1 Trade Cases ¶ 74,366 (C.D.Cal.1973); *U. S. v. Long Island Board of Realtors, Inc.*, 1972 Trade Cases ¶ 74,068 (E.D.N.Y.1972).

**10.** Penne alleges that the Board distributed the letters of some of its member firms in which they announced their "punitive split" policies soon after Penne applied for membership in the Board; and that the Board has enforced these "punitive split" policies through its Ethics and Arbitration Committee.

tising restriction that the Board imposed on its members for some years.[11] Since the Board is to remain in the litigation in any case, we think Penne should be allowed to explore these other alleged connections between the Board and the alleged conspiracy among the defendant firms in as much detail as the facts will warrant. Suffice it to say that on these other matters as well we are not convinced by the material now in the record that it is quite clear what the truth is and that no genuine issues remain for trial.

■ We express no opinion on the strength or weakness of Penne's case against the Board, but hold only that the Board's involvement in the alleged conspiracy to fix and maintain brokerage fees has not been conclusively disproved by pretrial discovery and that there remain material issues of fact that can only be resolved at later stages of the litigation. As the Supreme Court has cautioned, "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting System, supra,* 368 U.S. at 473, 82 S.Ct. at 491.[12]

The judgment of the district court is reversed, and the case is remanded for further proceedings.

---

11. The rule read as follows:
 *Section 5 Solicitations.* On a cooperative sale, only the listing participant is authorized to make any contact with the neighbors with sold cards, brochures, letters and the like, except with the consent of the listing broker. The Rule was withdrawn in 1978. The district court concluded that the fact of this advertising restriction "does not help plaintiffs because rules relating to advertising are independent of rules relating to commission splits." Memorandum and Order of February 14, 1977. How-

ever, Penne's claim against the Board does not rest solely on the issue of "punitive" commission splits; the claim is rather that the Board has been involved in a conspiracy to fix and maintain brokerage fees. The Board's advertising restriction would conceivably have something to do with such a conspiracy.

12. *Compare Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969).