**SYRACUSE BROADCASTING CORPORATION, Plaintiff-Appellant,**

v.

**Samuel I. NEWHOUSE, The Herald Company, The Post-Standard Company and Central New York Broadcasting Corporation, Defendants-Appellees.**

Nos. 255, 327, Dockets 27880, 28060.

United States Court of Appeals
Second Circuit.

Argued April 8, 1963.

Decided June 27, 1963.

James M. Landis, of Landis, Feldman, Reilly & Akers, New York City (Paul R. Frank, of Landis, Feldman, Reilly & Akers, New York City, and Smith & Sovik, Syracuse, N. Y., of counsel), for plaintiff-appellant.

Tracy H. Ferguson, of Bond, Schoeneck & King, Syracuse, N. Y. (William F. FitzPatrick and Gerald H. Weinstein, of Bond, Schoeneck & King, Syracuse, N. Y., of counsel), for defendants-appellees.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

This action, now in its twelfth year, was brought by the Syracuse Broadcasting Corporation, the operator of radio station WNDR (affiliated with the Mutual Broadcasting System), located in Syracuse, New York. Defendant Newhouse is the owner, directly or indirectly, of the three corporate defendants, The Herald Company, The Post-Standard Company and Central New York Broadcasting Company. The Central New

York Broadcasting Company operates radio station WSYR and television station WSYR-TV (both affiliated with the National Broadcasting System), also located in Syracuse. The other corporate defendants publish the sole daily and Sunday newspapers in that city.

Plaintiff's original complaint alleged causes of action against defendants for treble damages arising out of violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Sections 2, 7 and 8 of the Clayton Act, 15 U.S.C. §§ 13, 18, 19. The prior history of this litigation, including three appeals to this court (2 Cir., 236 F.2d 522; 271 F.2d 910; 295 F.2d 269), is set forth in detail in our opinion on the last appeal and need not be repeated here. The net result of these prior proceedings was the dismissal, in effect, of all allegations except plaintiff's claims of a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and of price discrimination in violation of Section 2 of the Clayton Act, 15 U.S.C. § 13, which were remanded for trial. In addition, plaintiff was precluded from offering evidence as to certain areas of alleged wrongdoing because it failed to comply sufficiently with a pre-trial order of the district court.

On remand from this court, the case went to trial before court and jury on June 4, 1962, on plaintiff's claims that defendants conspired to drive WNDR out of business and practiced price discrimination against WNDR. Plaintiff sought to prove the existence of this conspiracy by demonstrating that (1) defendant newspapers granted discriminatory advantages to WSYR such as disproportionate publicity and free advertising for WSYR and its advertisers; (2) defendant newspapers initiated a unit rate policy thereby increasing the advertising revenues of the newspapers to the detriment of WNDR; (3) defendant newspapers published false statements concerning WNDR; (4) defendant newspapers refused to publish articles favorable to WNDR that were submitted to them. At the close of plain-

tiff's evidence, the trial court granted defendants' motion for a directed verdict, finding that "the proof of the plaintiff is so meager on the ultimate issuable facts, that mere speculation would be allowed to do duty for probative facts, even though allowing the most reasonable possible inferences to be drawn for the plaintiff from its evidence." Plaintiff here appeals from the judgment entered upon the directed verdict, and from the method applied by the trial judge in assessing costs. We affirm on both appeals.

## I. The Sherman and Clayton Acts

*Discriminatory Advantages*

The primary proof relied on by plaintiff to demonstrate the existence of a conspiracy against it involved (1) the granting of allegedly disproportionate publicity to WSYR in the defendant newspapers as compared to that received by WNDR, and (2) allegedly free newspaper advertising received by WSYR and WSYR's advertisers that was not available to WNDR.

Both morning and evening papers carried without charge a radio log containing a complete listing of the programs available on each of the five radio stations then operating in Syracuse. The evening paper, The Herald Journal, published a feature captioned "Highlights" above the radio log which contained a listing of selected programs for the day having particular interest to the listening public; the Post-Standard, a morning paper, contained a similar feature captioned "Feature Listings." In addition, both papers carried a daily radio column written by its own columnist or critic. They also frequently mentioned individual stations in general news items interspersed throughout the papers.

At trial, plaintiff introduced in evidence some 500 selected "radio pages", illustrating what it considered to be the disparity between the number of times that the competing radio stations received mention. The relevant portions of these pages were read to the jury with comments by the station manager of

WNDR as to the allegedly discriminatory advantages thereby received by WSYR. Plaintiff also sought unsuccessfully to have introduced in evidence the remaining issues of the newspapers and a compilation summarizing, *inter alia,* the number of times WSYR was mentioned in the "Highlights" compared to WNDR, the number of inches in radio columns devoted to WSYR and its programs as compared to WNDR and the number of news items and inches of news items mentioning WSYR as compared to WNDR.

 The trial judge dealing with this phase of plaintiff's case stated that "In my judgment the quality is again lacking because exclusion of the plaintiff from the newspapers is not shown to have existed either from the news or radio columns. The radio log was printed free daily. Advertising could be purchased. Now, the contents of the radio highlights and columns can differ with the taste and judgment of the individual columnist and there is no proof that the content was limited by pressures to favor a conspiracy to damage the plaintiff." Admittedly, plaintiff was faced with a difficult problem of proof. However, its burden could not be satisfied by the mere counting of lines or news items mentioning either station for such evidence tends to be misleading, see Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed. 2d 85 (1962), and inequality of treatment is not sufficient to prove a violation of the antitrust laws. Although a

policy of excluding all mention of WNDR might well have been sufficient to permit the jury to infer that defendants' purpose was to put the plaintiff out of business, compare Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), in the circumstances present here, plaintiff was obliged to show that items deserving mention were suppressed or that the newspaper editors had been instructed to be unfair. Nothing in the record demonstrated that the selections of the writers of the "Highlights", "Feature Listings" or radio columns were the result of anything more than the free and conscientious exercise of their individual subjective judgments. Nor was plaintiff able to substantiate its extensive pre-trial claims that the defendant newspapers refused to publish newsworthy articles submitted to them by plaintiff.[1] Although the proof of the approximately 500 pages actually received in evidence did show a disparity favoring WSYR,[2] the probative value of such evidence was seriously weakened by testimony of WNDR's station manager that he had told his board of directors that "Mutual's programs * * * were so poor that they could not be relied upon to build audiences and * * * in his opinion it would be better for WNDR to be a good independent station than a poor network one."

On the issue of the granting of free advertising, there was some conflict of testimony as to whether free advertising was in fact the practice. The books of the newspapers contained no record of

1. Plaintiff's extensive pre-trial claims that the newspapers refused to publish newsworthy articles submitted to them by plaintiff dwindled at trial to two instances. One of these concerned Mr. Frank Hennessy, a broadcaster, who was moving from WSYR to WNDR. Although the release was not published in the form submitted by WNDR, Mr. Hennessy's relocation did receive mention in a radio column. The other release concerned the appearance of Mr. Robert Forsell on Mr. Hennessy's program and was not published in the newspapers. This one instance can hardly be said to have demonstrated a

policy of not publishing releases submitted to the papers by WNDR.

2. With respect to these pages, WSYR's programs were selected in the "Highlights" 1268 times as compared to 27 for WNDR, WSYR was mentioned 753 times in radio columns in the Herald-Journal while WNDR was mentioned 71 times, 53 news items in the Herald-Journal contained material about WSYR while only 2 concerned WNDR, and 164 news items in the Post-Standard contained material about WSYR in contrast to 15 concerning WNDR.

any charges made by either paper for advertising by WSYR; the records of the radio station, however, reflected payments by the newspapers for advertising over WSYR. Defendants argued that the testimony of Mr. Vadeboncoeur, the Vice-President of WSYR, proved that WSYR had an exchange agreement with the newspapers, trading radio time for newspaper space. Also in conflict was the question of whether free advertising was granted in the newspapers to advertisers over WSYR. The record did disclose that some of WSYR's ads in the papers included the name of the sponsor of the particular program being advertised. Defendants argued that the newspaper space was paid for by the exchange agreement and that the fact that WSYR's advertisers paid for the newspaper charges was demonstrated by a comparison of WNDR's and WSYR's rate cards which revealed that the advertising rates charged by WSYR were considerably higher than those charged by WNDR. WNDR countered this by arguing that the higher rate charged by WSYR was not a reflection of the advertising afforded sponsors in the newspapers but rather was the result of the fact that WSYR's superior rating justified higher charges.

■ Assuming in plaintiff's favor, as we do in reviewing the direction of a verdict against it, that plaintiff presented sufficient evidence to warrant the jury in finding that the newspapers granted free advertising to WSYR, the question remains as to whether this, along with the other evidence that plaintiff presented, would have supported a conclusion that defendants had engaged in a conspiracy in restraint of trade. Of considerable importance here is the fact that the newspapers and radio stations were jointly owned. There is no doubt that the fact of common ownership will not prevent the finding of a conspiracy, the Supreme Court having rejected the argument that there cannot be a conspiracy among affiliated enterprises. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Kiefer-Stewart Co. v. Seagram & Sons,

340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Timkin Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). However, that Court has also stated that the Sherman Act "is aimed at substance rather than form." United States v. Yellow Cab Co., supra, 332 U.S. at 227, 67 S.Ct. 1565, 91 L.Ed. 2010. Looking at the substance of the transactions here, it is apparent that any free advertising, if given, merely affected a redistribution of corporate profits. There is nothing to indicate that WSYR could not have paid for its advertising. If it had paid for the advertising, the newspapers would have received additional revenue; if it did not pay, its own revenues would have been correspondingly increased. Therefore, the granting of free advertising is as equally probative of a corporate policy of leaving certain funds in one corporation rather than transferring them to the books of another as it is of a conspiracy to restrain trade. There is nothing to indicate that requiring WSYR to pay for its advertising would in any way have aided plaintiff in competing with WSYR. The primary vice in these arrangements, at least from WNDR's point of view, lies not in the granting of free advertising, but in the common control of the corporations involved. The combination of resources available to defendants naturally make it more difficult for a competitor having more limited resources. However, the dismissal of plaintiff's claims under Section 2 of the Sherman Act and Sections 7 and 8 of the Clayton Act was affirmed on the first appeal. 236 F.2d 522.

These circumstances sufficiently distinguish this case from those in which the Supreme Court has held that the corporate interrelationship between conspirators does not provide an immunity from the anti-trust laws. In United States v. Yellow Cab, supra, joint ownership and restrictive agreements thereby effectuated were under attack. Kiefer-Stewart v. Seagram & Sons, supra, involved a conspiracy to fix the maximum prices over which wholesalers could not

sell, a *per se* violation of the anti-trust laws.

*The Unit Rate*

Effective September 1, 1949, defendant newspapers initiated a unit rate policy affecting only national newspaper advertisers who were thereafter charged a single rate of 50 cents a line for space in both papers. This policy was adopted at the same time that a substantial number of newspaper publishers around the country had adopted a similar policy, see Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 604, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), and was initiated at the suggestion of a representative of the Kelly-Smith Company, an agency soliciting national advertising for the Post-Standard. It is plaintiff's contention that the unit rate is further evidence of the conspiracy in that its effect was to divert funds of national advertisers to the defendant newspapers, which funds would otherwise have been available for competing media.

In support of its claims, plaintiff in its pre-trial documents offered to prove, through the testimony of its national advertising representative, that the unit rate caused a depletion in the advertising budgets, available for the Syracuse area, of specific national advertisers from whom it was attempting to secure business. Plaintiff also claimed that some of the advertisers as well as some of its salesmen would also testify.

■ At trial, plaintiff offered to bring from California an "expert", Mr. Charles A. Walden, who had testified on a similar matter in the case of Kansas City Star Co. v. United States, 240 F.2d 643 (8th Cir.), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). Plaintiff's offer of proof stated that this expert would testify in support of its theory of depletion of national advertising budgets resulting from the unit rate and that he would rely on statistics showing an increase in Post-Standard's national advertising at the same time that its display and classified advertising not subject to the unit rate was declining and showing a decline in the national spot advertising on the Syracuse radio stations while similar advertising was increasing in other areas of upstate New York. This offer was rejected by the trial judge who found that there was no evidentiary basis in the exhibits already introduced in evidence for the conclusion tendered, citing Herman Schwabe, Inc. v. United Shoe Machinery Corp. The trial judge properly held that the Walden testimony was inadmissible. There was insufficient evidentiary foundation for the expert's ultimate conclusion that the budgets of national advertisers were depleted by the imposition of the unit rate so that the funds available for other competing media were correspondingly diminished. Moreover, the expert would have been in no position to do any more than speculate on the extent to which the unit rate policy contributed to any decline in the advertising revenues of WNDR. Only through sheer guesswork could any such estimate be made, especially without any consideration of whether WNDR's revenue losses were due to factors other than the unit rate such as the quality of the programs offered on the station.

■ Plaintiff could have, as it apparently originally intended, called specific advertisers to testify as to the effect of the unit rate, if any, but this it failed to do. Thus the proof actually admitted into evidence was insufficient to go to the jury on this issue.[3]

---

3. Even if Walden had been permitted to testify and had been able to establish that the unit rate enabled the newspapers to get a greater portion of the national advertiser's dollar at the expense of the radio stations, the proof would have been insufficient to establish a restraint of trade in violation of Section 1 of the Sherman Act. The reasonableness of a restraint depends on "the percentage of business controlled, the strength of the remaining competition [and], whether the action springs from business requirements or purpose to monopolize." United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 615, 73 S.Ct.

*Publication of False Statements*

Plaintiff complains of the publication of nine items in defendant newspapers from September 26, 1952, through October 22, 1952, dealing with WNDR's apparent difficulties in meeting its rent payments.[4] Only two of these articles, both appearing on October 22, 1952, are claimed to be false. It is argued that this "barrage" of unfavorable publicity is further proof of the alleged conspiracy.

■ The publication of truthful reports of plaintiff's financial difficulties is in no way indicative of a conspiracy against plaintiff. It should be noted, in addition, that defendant newspapers contained no mention of plaintiff's difficulties during the years 1948 through 1951 (when the conspiracy was allegedly in operation) despite the fact that the United States Government during those years had filed tax liens for unpaid withholding taxes and old age and survivors benefit taxes in substantial sums. With respect to the two items claimed to be false, although one of the headlines complained of is somewhat misleading, the articles in full accurately portrayed the status of the proceedings brought by the Wilson Realty Company against plaintiff for unpaid rent.

*Price Discrimination*

The trial judge dismissed the plaintiff's claim of price discrimination on the grounds that there was no showing of a substantial lessening of competition in the relevant market and on the additional ground that radio advertising is not a commodity under the terms of the Clayton Act. Since plaintiff has abandoned its price discrimination claim on appeal, no discussion of the grounds relied upon by the District Court is necessary.

■ The trial judge concluded that there were no disputed factual issues crucial to the legal merits requiring the deliberations of a jury in this case. After close to twelve years of time and effort spent by attorneys for both parties, two judges in the district court, and four panels of this court, the case as tried was merely a shell of the claims made when it originally appeared. Judge Medina's premonition on the first appeal that "It may well be that the state of the evidence on the trial at the conclusion of plaintiff's case will warrant the direction of a verdict in the defendants' favor" has proven to be an accurate one. Plaintiff, having finally had his day in court and supposedly armed with substantial

872, 97 L.Ed. 1277 (1953). The Supreme Court in Times-Picayune, where the unit rate posed a far more serious threat to the competitive situation than here, upheld its use as against the sole competing newspaper in New Orleans. Here, not only was the defendants' share of the total radio-newspaper advertising revenue in Syracuse too low to warrant any inference that competition would seriously be threatened by the unit rate, cf. Syracuse Broadcasting Corp. v. Newhouse, 236 F.2d 522 (2d Cir., 1956), but plaintiff further failed to prove that the unit rate was anything other than a legitimate business method adopted in the newspapers' own interests. The Supreme Court in Times-Picayune recognized that the initiation of a unit rate policy by newspapers throughout the country (at the same time that policy was adopted by defendants) was designed to "counteract a national advertisers' trend away from newspapers toward other mass communication media." 345 U.S. at 624, 73 S.Ct. at 888–889, 97 L.Ed. 1277.

4. WNDR Given Until Monday to Pay Rent or Be Evicted
 (Herald-Journal, Sept. 26, 1952)
 WNDR Must Pay Rent by Monday or Face Eviction
 (Post Standard, Sept. 27, 1952)
 Trouble Piles Up Anew for WNDR
 (Herald-Journal, Sept. 30, 1952)
 Financial Troubles Continue for WNDR
 (Post Standard, Oct. 1, 1952)
 Another Judgment Filed Against WNDR
 (Post Standard, Oct. 3, 1952)
 Syracuse Headlines. The John Wilson Realty Co. went into Municipal Court again to collect rent from Station WNDR, which has offices and studios in the Wilson Building. The Station was also sued by a former employee.
 (Post-Standard, Oct. 22, 1952)
 Radio Station Given Until November 10th to Pay Rent or Be Evicted
 (Post-Standard, Oct. 22, 1952)
 WNDR Again Gets Eviction Order
 (Herald-Journal, Oct. 22, 1952)

proof of a conspiracy against it, appeared instead with a case insufficient in law and fact. The statement of the trial judge in directing the verdict that "to withhold decision, as is usually done by a trial judge at this stage of trial by jury, in the exercise of caution, would be unjustified, unfair to these four defendants and contrary to the interest of justice" was a fair conclusion upon the record before him.

## II. The Cost Appeal

The trial judge taxed costs against the plaintiff in the amount of $9,374.75. Of this amount, $8,235.00 was for the daily transcript of the second trial, $350.00 was for the daily transcript of the first trial, and $738.25 was for the transcript of pre-trial proceedings prior to the first trial.

Four copies of the transcript of the second trial were ordered, one for the court, one for plaintiff and two for defendants. The total charge was computed at the rate of $1.50 for the first copy, $.90 for the second, $.75 for the third and $.50 for the fourth. Defendants were charged by the reporters for the entire cost of the first and third copies and one-half of the last copy which was designated by the reporters as the "copy to the Court." The trial judge allowed defendants to tax as costs the entire cost of the first copy and one-half of the fourth copy. The plaintiff claims that the stenographic transcript on a daily basis was not "necessarily obtained for use in the case," 28 U.S.C. § 1920(2), and the taxation of its cost was improper. The question of whether the expense of a daily transcript is to be taxed in favor of the prevailing party is a matter resting largely in the discretion of the trial court. Euler v. Waller, 295 F.2d 765 (10th Cir., 1961); T & M Transportation Co. v. S. W. Shattuck Chemical Co., 158 F.2d 909 (10th Cir., 1947). The trial judge was of the view that a daily transcript was necessary because of the complicated and blurred issues involved and the mass of evidence that was introduced. In the light of the history of this litigation, taxation of these costs was not an abuse of discretion. See Perlman v. Feldman, 116 F.Supp. 102 (D.Conn.1953).

Plaintiff also asserts that it should have been charged for only one copy at the average price for the four copies furnished. Although the designation of the last copy as the court's copy is somewhat confusing, especially since the reason why four copies were used was because an extra one was ordered by defendants, the imposition of costs in the manner used by the trial court was not an abuse of discretion.

In addition, both the transcript of the prior trial and of the pre-trial hearings were necessary for use in the first trial, the subsequent appeal and the second trial and the taxing of these transcripts as a cost was not improper. Perlman v. Feldman, supra.

Both appeals affirmed.