Paul Y. CHASTAIN et al., Plaintiffs,

v.

AMERICAN TELEPHONE & TELE-GRAPH CO., Defendant.

Civ. A. No. 2088–70.

United States District Court,
District of Columbia.

Sept. 30, 1975.

Daniel M. Gribbon, Washington, D.C., for plaintiffs.

Jerry S. Cohen, Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This matter came before the Court on plaintiffs' motion for summary judgment and defendant's opposition thereto. In their memoranda and in the oral arguments of this motion, plaintiffs have urged the Court to find that AT&T violated sections one and two of the Sherman Act [1] by participating in a group boycott of plaintiffs' mobile telephone product and by attempting to monopolize the mobile telephone market. For the reasons set forth herein, the Court must deny plaintiffs' motion.

### I. *Factual Background.*

The affidavits, stipulations, exhibits, and answers to interrogatories submitted in connection with this motion establish the following facts relevant to the period at issue here, i. e., January, 1968, to July, 1970, when the complaint was filed (hereinafter called the "complaint period.").

Plaintiffs are fifteen unaffiliated individuals or business entities that engaged in distribution of a mobile telephone device called "Melabs Attache Phone" [2] during the complaint period. Plaintiffs' places of business were located throughout the United States, with each plaintiff's distributorship region encompassing a limited geographical area. These areas ranged in size from single counties to several states. Approximately six of the plaintiffs terminated their distributorships during the complaint period.

Defendant AT&T and its operating company subsidiaries (collectively referred to as the "Bell System") provide, directly and through interconnection with other telephone companies, common carrier communication services throughout the continental United States. Within the Bell System the parent company, AT&T, provides long distance interstate common carrier communications services by interconnecting the territories of local telephone companies within the United States and with foreign countries. AT&T also provides various technical, commercial and legal services to its subsidiaries. AT&T's operating company subsidiaries and other telephone companies provide local telephone services. The conditions attached by AT&T and its operating companies to their provision of mobile telephone service gave rise to this lawsuit.

The mobile telephone service provided by defendant's operating companies and other telephone companies combines the use of radio frequencies and telephone lines to permit telephone users to call to or from, or receive calls placed to or from, points not physically connected to telephone wires. The mobile telephone service subscriber transmits or receives calls placed to or from telephone company "base stations" by means of a "mobile telephone." Mobile telephones may

1. 15 U.S.C. §§ 1, 2 (1970).

2. The manufacturer of Melabs Attache Phone, SCM–Melabs, Inc., is not affiliated with plaintiffs and is not a plaintiff in this case.

be obtained from the telephone company that agrees to provide the mobile telephone service, or from other sources, such as the plaintiffs.

Mobile telephones are designed to communicate with telephone-company-operated "base stations" by means of radio signals sent over certain radio "channels" (i. e., pairs of frequencies) that are reserved by the FCC for the use of mobile phones.[3] The base stations function as intermediaries between mobile telephones and the landline telephone network. Base stations transmit landline calls to mobile telephones over the appropriate available radio channel and, conversely, switch calls from mobile telephones into the landline telephone network.

The affidavits filed by both sides in this case establish that an additional type of mobile telephone service was provided by radio common carriers ("RCC's") during the complaint period. AT&T's answers to interrogatories define radio common carriers as "communications common carriers which are not engaged in the business of providing either a public landline message telephone service or public message telegraph service."[4] The record does not clearly explain the nature of the service afforded by RCC's and the manner in which that service differs, if at all, from the mobile service provided by telephone companies.

The Attache Phone marketed by plaintiffs during the complaint period was a mobile telephone contained in a briefcase-like case and designed to be completely portable. The mobile phones provided by AT&T's operating companies during that period, however, were designed solely for installation in cars or

trucks. Both portable and vehicular mobile phones were produced and/or marketed during the complaint period by companies other than plaintiffs and AT&T's operating companies. The mobile phones provided by AT&T's operating companies were manufactured by companies not affiliated with the Bell System.[5]

FCC regulations[6] require that persons who wish to use a mobile telephone in connection with mobile telephone service provided by telephone company base stations must first obtain a license from the FCC.[7] An individual license need not be obtained by mobile telephone users who obtain their equipment from the Bell System operating companies, however, since company-supplied equipment is covered by licenses granted to the operating companies that own and maintain the equipment. Mobile telephone users who provide their own equipment must present to the FCC at the time of applying for a license evidence that mobile telephone service will be furnished to them. This requirement may be satisfied by presenting a "letter of intent" from the appropriate Bell System operating company. The letter of intent indicates the company's willingness to provide service once a license to operate the mobile phone is obtained.

After the mobile phone is licensed, it must be registered at a base station and given a telephone number by the local phone company that operates the base station of registry. Generally the phone must be registered at the base station that serves the area within which the mobile phone user expects to make the majority of his calls. Mobile phones can also function outside the base station area of registry i. e., in

---

3. The number of channels available varies from area to area, but the maximum number allotted during the complaint period was eleven.

4. Answers of Defendant AT&T to Plaintiffs' Interrogatories, No. 10J.

5. General Electric and Motorola manufactured most of the mobile telephones supplied by Bell System operating companies.

6. 47 C.F.R. § 21.0 et seq. (1974).

7. Plaintiffs' affidavits state that no license is required to operate mobile telephones in connection with RCC-provided service.

"foreign" base station areas, under most circumstances.[8] Mobile phones operating in foreign base station areas are called "roamers."

Mobile phones were and are still designed either for "manual" or "automatic" operation. Attache Phone was a manually operated mobile phone. Manual mobile phones have channel selection buttons instead of a dial, and they require the assistance of a mobile service operator at the appropriate base station in order to place or receive calls. Each manual mobile phone is equipped with channel selection buttons that give the user access to any of the channels on which the unit is equipped to operate. When a channel is being used by one mobile phone in a particular base station's service area, no other mobile phone in that area can use that channel. For this reason a manual mobile phone user cannot place a call until he finds an open channel by pushing each button and listening to each channel in succession until an open channel is found. The user then signals a mobile service operator at the base station, whereupon the operator completes the call. The service provided by telephone companies to manual mobile telephones is called simply "mobile telephone service," which is usually abbreviated MTS.

Beginning about 1963, the Bell System operating companies began equipping their base stations for automatic mobile telephone service instead of MTS. The Bell System called the automatic service Improved Mobile Telephone Service, abbreviated IMTS. IMTS functions similarly to MTS except that the IMTS-equipped mobile phone has a dial. The IMTS mobile phone user dials his own calls and can in most cases complete calls without the assistance of a base station operator. Idle channels available for incoming or outgoing calls are selected automatically by the IMTS-equipped mobile telephone, thereby obviating the need for manual monitoring of channels and precluding eavesdropping by other IMTS users in most cases. Affidavits presented by AT&T indicate that by the end of 1971 there were 313 Bell System base stations designed to provide manual mobile telephone service in the Attache Phone's designated frequency range and 176 Bell System IMTS base stations designed to provide service in Attache Phone's frequency range.[9]

The automatic feature of IMTS substantially decreased but did not totally eliminate the need for mobile service operators at the IMTS base stations. Most calls placed to or from roaming IMTS-equipped phones require operator assistance.[10] In fact, roaming IMTS-equipped phones function in much the same way as manual mobile phones, and, in order to operate as roamers, IMTS phones must be equipped with channel selection buttons like those installed on manual phones. Equipped in this way IMTS mobile phones as well as manual mobile phones can operate in foreign MTS and IMTS base station areas, provided, however, that the mobile phone and the base station have at least one radio channel in common and the IMTS base stations have mobile service operators available to assist in receiving and transmitting manual calls.

With the introduction of IMTS in the 1963–65 period, defendant AT&T and its operating company subsidiaries adopted the policy that plaintiffs attack here as an antitrust violation. AT&T and its subsidiaries decided to deny letters of intent in IMTS base station areas to any prospective mobile phone user whose phone was not dial-equipped for use with IMTS. The reason given by the

8. See discussion *infra* at p. 155.

9. Affidavit of Richard T. Dugan, ¶ 35.

10. All long distance calls from roaming IMTS-equipped phones and, in many base station areas, local calls from roaming IMTS-equipped phones require mobile operator assistance. All calls placed to IMTS phones through foreign base stations require operator assistance. Affidavit of A. A. Bottani, Jr., ¶ 12.

Bell System to support this policy was that manual phones were "incompatible" with IMTS systems, in that the use of manual phones in IMTS areas undermines the main advantages afforded by IMTS systems. Those advantages include, *inter alia,* privacy of mobile phone conversation and more efficient use of the radio channels. The Bell System did not claim that Attache Phone or other manual phones physically harm IMTS equipment, and in fact, no such claim could have been made since the Attache Phone was specifically "Type Accepted" by the FCC in 1969 as suitable for use with IMTS systems. Since a dial-equipped portable mobile phone was not developed until after plaintiffs had filed their complaint in this case,[11] the Bell System's IMTS area policy prevented all distributors of portable phones from selling their products for use with Bell System IMTS base stations.

In many Bell System base station areas, however, radio common carriers apparently provided an alternative source of mobile telephone service. According to an affidavit submitted by AT&T, 682 of the 1,926 mobile telephone systems in service at the end of 1971 were operated by RCC's normally serving areas that were also served by either a Bell System operating company or an independent company.[12] The affidavit further states that most RCC's provide manual mobile telephone service and, in Bell System areas, are "in most cases physically interconnected with Bell System operating companies so that RCC customers may have access to land-line telephones throughout the country."[13] Two of the affidavits submitted by plaintiffs seem to imply, however, that RCC service provides a relatively inadequate substitute for mobile telephone service insofar as interstate calls are concerned.[14]

During 1968 and 1969 the plaintiffs separately entered into contracts with either the manufacturer of Attache Phones or with other distributors to distribute Attache Phones. Soon thereafter, as each plaintiff in turn became aware of the Bell System's policy of refusing to register manually operated mobile phones in IMTS areas, most of the plaintiffs began selling Attache Phones equipped for use with RCC's instead of the Attache Phones equipped with a "Bell System configuration." Some plaintiffs never sold any Attache Phones other than phones equipped with an "RCC-configuration," and no plaintiff sold more than 19 phones equipped with a Bell System configuration. A customer of one plaintiff traded in the Attache Phone he had purchased for use with Bell System service for a phone equipped for RCC service. The practical differences between the two types of configurations are not explained in the record.

In 1970 plaintiffs filed this lawsuit against AT&T alleging, *inter alia,* that the Bell System's IMTS area policy violates the antitrust statutes in several respects. In 1972 the plaintiffs filed this motion for summary judgment. After hearing oral argument, the Court issued a Memorandum-Order on December 18, 1972,[15] by which this matter was referred to the FCC for its opinion pursuant to the doctrine of primary jurisdiction. The Court requested the FCC to determine the reasonableness, validity and effect of the Bell System's IMTS area policy under the Communications

11. Not until June 3, 1971, was a portable IMTS mobile telephone type-accepted by the Commission. See *In re Referral of Chastain v. AT&T*, 43 F.C.C.2d 1079, 1083 (1973).

12. Affidavit of Richard T. Dugan, ¶ 38. The affidavit also states that at the end of 1971, 609 mobile telephone systems were operated by Bell System companies and 635 were operated by independent telephone companies, in addition to the RCC-operated systems.

13. *Id.*

14. Affidavit of Benjamin Rosenberg; Affidavit of William Hennings.

15. *Chastain v. AT&T*, 351 F.Supp. 1320 (D. D.C.1972).

Act of 1934.[16] On November 26, 1973, the FCC issued a Memorandum Opinion [17] in which it found, by a 4–3 majority, that the Bell System's policy violated four sections of the Communications Act.[18] The most relevant portion of the FCC's Order for purposes of plaintiffs' motion for summary judgment was the finding that the Bell System's IMTS area policy unreasonably deprived portable mobile telephone users of mobile telephone service in those IMTS base station areas where channel congestion did not exist. To the same extent, the Bell System's IMTS area policy was found unreasonably discriminatory to portable mobile phone users. In making these findings, the Commission emphasized that portable IMTS units were not available during the complaint period, that mobile service was provided to roaming IMTS-equipped phones in IMTS areas, and that the demand for portable manual telephones was apparently small.[19] Despite the finding that the IMTS area policy was unreasonable in part, the FCC noted that IMTS is an innovation which furthers the public interest and represents a significant improvement over manual mobile telephone systems.[20] Moreover, the Commission stated: "We have no doubt that the steady implementation of IMTS has as its impetus the desire to alleviate these problems, and . . . that when a portable manual telephone . . . is utilized in an IMTS system, disadvantages are apparent."[21]

Soon after the issuance of the FCC's Memorandum-Order of November 26, 1973, three vacancies occurred on the Commission. Because only a bare majority of Commissioners had supported the first FCC Memorandum Order, the Court determined not to act on the pending motion for summary judgment until the FCC had had an opportunity to consider a petition for reconsideration filed by defendant. On November 20, 1974, the FCC denied the petition for reconsideration. The Court then received additional briefs and heard additional oral argument.

## II. Relation of the FCC's Findings to this Litigation.

■ The Court's referral of this matter to the FCC earlier in this litigation implied no view as to whether defendant's conduct amounted to a group boycott. The purpose of referrals to regulatory agencies pursuant to the doctrine of primary jurisdiction is simply to give the relevant regulatory agency the opportunity to determine the reasonableness and validity of the challenged practice under the regulatory scheme before the Court determines the reasonableness and validity of the practice under the antitrust laws. In this way the primary jurisdiction doctrine seeks to prevent "sporadic action by federal courts . . . [from] disrupt[ing] an agency's delicate regulatory scheme."[22]

■ In this case the findings of the FCC as to matters within its regulatory expertise, such as the reasonableness of the IMTS area policy within the meaning of the Communications Act, will be deemed established for purposes of this litigation, unless and until the FCC's decision, now being appealed, is vacated by the D.C. Circuit. As to matters not within the FCC's expertise, such as the reasonableness of the IMTS area policy within the meaning of the

16. 47 U.S.C. § 201 et seq. (1970).

17. In re Referral of Chastain v. AT&T, 43 F.C.C.2d 1079 (1973).

18. Sections 201(a), 202(a), 203(c), & 214(a) of the Communications Act of 1934, 47 U.S. C. §§ 201(a), 202(a), 203(c), and 214(a) (1970).

19. In re Referral of Chastain v. AT&T, 43 F.C.C.2d 1079, 1083 (1973).

20. Id. at 1082.

21. Id.

22. United States v. Radio Corp. of America, 358 U.S. 334, 348, 79 S.Ct. 457, 466, 3 L. Ed.2d 354 (1959); see Carter v. AT&T, 365 F.2d 486 (5th Cir. 1966) (primary jurisdiction reference held imperative even though no determination had been made as to application of the antitrust laws).

Sherman Act, and the policy's effect on competition, the FCC's findings will be received as evidence where relevant, but the findings will not be treated as conclusive.

### III. *Merits of the Motion.*

Before the Court on this motion is the question whether the Bell System's policy of refusing to register or to provide letters of intent to provide service to Attache Phones in IMTS base station areas violated the Sherman Act as a matter of law. Plaintiffs advance two theories in support of a finding of Sherman Act liability. First, plaintiffs contend that the Bell System's refusal to provide mobile service to Attache Phones constituted a group boycott by defendant AT&T and its operating company subsidiaries, and that AT&T must therefore be found to have committed a per se violation of section one of the Sherman Act. Second, plaintiffs argue that AT&T, in combination with its subsidiaries, violated sections one and two of the Sherman Act by using the Bell System's monopoly power over telephone services to foreclose competition in the mobile telephone equipment market. In connection with this second theory, plaintiffs characterize AT&T's offense alternatively as a combination in restraint of trade, violative of section one, or an individual or combined attempt to monopolize the mobile phone market, violative of section two. Because of the existence of genuine issues of material fact, neither of plaintiffs' theories justifies summary judgment, as will be elaborated *infra.* Before discussing plaintiffs' theories, however, the Court must evaluate defendant's claim of antitrust immunity.

### *Applicability of Parker v. Brown*

Defendant argues that the Bell System's implementation of the IMTS area policy amounts to state action within the meaning of *Parker v. Brown*[23] and is therefore exempt from the Sherman Act. In *Parker* the Supreme Court held that an anticompetitive state-created and state-enforced program for marketing raisins did not violate the Sherman Act because the program "derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command."[24] AT&T argues that *Parker* applies to this case because state regulatory agencies, and not the FCC, regulate the intrastate aspects of mobile telephone service.

State regulation of mobile telephone service, as described by defendant, is undeniably extensive. Local telephone companies, including Bell System companies, are required to file with the state regulatory agencies tariffs setting forth the rates and regulations relating to the provision of intrastate service by the company. The tariffs are subject to review and investigation by the state agencies. During the complaint period mobile service tariffs that had been filed with the state agencies by the Bell System operating companies typically required that customer-supplied equipment "shall be suitable for the proper operation of the [mobile telephone] service."[25] AT&T claims that the Bell System's IMTS area policy was implemented pursuant to these tariffs and that implementation of the policy therefore represented state action within the meaning of *Parker.*

■ The Court need not decide in this case whether regulation of mobile telephone service is conducted predominantly by state agencies, as defendant contends, rather than by the FCC, because as a matter of law the nature of the state agencies' involvement in defendant's IMTS area policy does not meet the *Parker* standard. As the Su-

23. 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

24. *Id.* at 350, 63 S.Ct. at 313.

25. Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, at 34.

preme Court stated recently in *Goldfarb v. Virginia State Bar*:[26] "The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as Sovereign."[27] In *Goldfarb* the Court refused to immunize as state action lawyers' minimum fee schedules issued and enforced by the State and County Bar, even though the State Bar was a state-created agency. The Court reasoned that no state law or rule of the state Supreme Court required or directed the issuance and enforcement of minimun fee schedules.[28]

█ In this case, as in *Goldfarb*, no state agency directed or required the defendant to engage in the allegedly anticompetitive activity. Even assuming that the state regulatory agencies had considered and approved the tariffs filed by the Bell companies, the terms of the tariffs were too general to permit characterization as specific state directives or requirements that the Bell System implement the IMTS area policy. In fact, it cannot be assumed that the state agencies understood that the wording of the tariffs, as interpreted by the Bell System, would exclude portable phones from service in IMTS areas. For these reasons the circuit court cases cited by defendant, in which *Parker* has

been applied to actions taken pursuant to specific rate schedules filed with state regulatory agencies,[29] are inapposite here. The Court relies instead on the ample authority supporting denial of *Parker* immunity where the regulated industry's actions are not specifically directed or approved as to particulars by the state regulatory agency.[30]

### The Intra-corporate Conspiracy Issue

An underlying premise of plaintiffs' group boycott theory is that AT&T and its wholly-owned subsidiaries may be treated as separate entities capable of conspiring with each other. Defendant argues, however, that the Bell System acts not as a group, but as a single entity insofar as its IMTS area policy is concerned.

In several cases, beginning with *United States v. Yellow Cab Co.*,[31] and *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,[32] the Supreme Court has stated without qualification that the fact of common ownership does not prevent a finding of conspiracy among separately incorporated companies.[33] Commentators have criticized this so-called "intra-corporate conspiracy doctrine"[34] and have inferred limitations on the doctrine from the facts of the Supreme Court cases that articulated it.[35] Nonetheless, many lower courts have broadly en-

26. 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

27. *Id.* at 790, 95 S.Ct. at 2015.

28. *Id.*

29. See *Gas Light Co. of Columbus v. Georgia Power Co.*, 440 F.2d 1135 (5th Cir. 1971), *cert. denied*, 404 U.S. 1062, 92 S.Ct. 732, 30 L.Ed.2d 750 (1972) ; *Washington Gas Light Co. v. Virginia Electric & Power Co.*, 438 F.2d 248 (4th Cir. 1971).

30. See *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1293 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) ; *IT&T v. General Tel. & Elec. Corp.*, 351 F. Supp. 1153, 1202–03 (D.Hawaii 1972) ; *Marnell v. United Parcel Service of America*, 260 F.Supp. 391, 406–09, (N.D.Cal.1966).

31. 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

32. 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

33. 332 U.S. at 227, 67 S.Ct. 1560 ; 340 U.S. at 215, 71 S.Ct. 259 ; see also *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1967) ; *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

34. See, e.g., Handler, "Twenty-Five Years of Antitrust," 73 Col.L.Rev. 415, 452–53 (1973) ; Willis & Pitofsky, "Antitrust Consequences of Using Corporate Subsidiaries," 43 N.Y.U.L.Rev. 20, 24 (1968).

35. See Willis & Pitofsky, "Antitrust Consequences of Using Corporate Subsidiaries," 43 N.Y.U.L.Rev. 20 (1968) ; Attorney General's National Committee to Study the Antitrust Laws, *Report* at 34 (1955).

dorsed the doctrine in dictum or in cases where no Sherman Act violation was found.[36] In many cases appellate courts have relied on the doctrine in reversing grants of summary judgment that had been premised on the defendants' corporate interrelationship.[37] Rarely have courts actually found affiliated corporations guilty of conspiring in violation of the Sherman Act, however, and then only in cases where, after a full trial, the facts established, either expressly or by necessary implication, that the corporations had acted without a legitimate business purpose and with anticompetitive intent.[38] In some cases the courts have refused to apply the doctrine, finding it inappropriate to the factual context.[39]

■ The cases in the last two categories mentioned suggest what seems to this Court the proper approach to the intra-corporate conspiracy issue. In those cases the courts decided whether or not to treat the defendant companies as conspirators only after determining, on the basis of all the facts, whether the companies' actions amounted to, in pur-

pose and effect, a conspiracy in restraint of trade. As the Supreme Court said, in first applying the doctrine in *Yellow Cab, supra,* the Sherman Act "is aimed at substance rather than form."[40] Accordingly, if in this case the Bell System companies each adopted and implemented the IMTS area policy with anticompetitive intent, and if the policy exerted an effect substantially similar to that of a conspiracy among independent companies in restraint of trade, then the Bell System's corporate affiliation will provide no defense. The resolution of this issue depends on the facts to be established at trial.

### The Group Boycott Claim

■ Group boycotts have long been classified as per se violations of the Sherman Act.[41] This means, theoretically, that a plaintiff proves a violation of section one simply by establishing that a group boycott has occurred, regardless of the motivation underlying the boycott and the extent of the public harm effected by the boycott.[42] Thus if, in the instant case, the Bell System's ad-

36. See *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.,* 508 F.2d 547, 557 (1st Cir. 1974); *Chisholm Bros. Farm Equip. Co. v. Int'l. Harvester Co.,* 498 F.2d 1137, 1142 n. 10 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); *GTE Service Corp. v. F.C.C.,* 474 F.2d 724, 733 n. 14 (2d Cir. 1973); *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 205 (5th Cir. 1969); *Credit Bureau Reports, Inc. v. Retail Credit Co.,* 358 F.Supp. 780 (S.D.Tex. 1971).

37. See *Battle v. Liberty Nat'l. Life Ins. Co.,* 493 F.2d 39, 44 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *TV Signal Co. v. AT&T,* 462 F.2d 1256, 1260 (8th Cir. 1972); *Tamaron Dist. Co. v. Weiner,* 418 F.2d 137, 139 (7th Cir. 1969).

38. *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *United States v. General Motors Corp.,* 121 F.2d 376 (7th Cir. 1941).

39. *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Syracuse Broadcasting Corp. v. Newhouse,* 319 F.2d 683 (2d Cir. 1963); *Beckman v. Walter Kidde & Co.,* 316 F.Supp. 1321, 1326 (E.D. N.Y.1970), *aff'd,* 451 F.2d 593 (2d Cir. 1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).

40. 332 U.S. 218, 227, 67 S.Ct. 1560, 1565 (1947); see also *Syracuse Broadcasting Corp. v. Newhouse,* 319 F.2d 683, 687 (2d Cir. 1963).

41. See *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild of America v. F.T.C.,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

42. See *Northern Pac. R. R. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

herence to the IMTS area policy constituted a group boycott within the meaning of the Sherman Act, AT&T has violated the Act as a matter of law.

Although in many cases concerted refusals to deal have been categorized as group boycotts and, therefore, as per se violations of section one,[43] at least three circuits have held in recent years that not all concerted refusals to deal should be accorded per se treatment.[44] These holdings have rested on the expressed recognition that the per se rule was developed by the Supreme Court to reach only those types of conduct that amount to "naked restraints of trade with no purpose except stifling of competition."[45] All three circuit courts carefully analyzed the group boycott cases and determined that in every case where a per se rule was applied, the court had either found that the defendants' purpose was to exclude a competitor or was otherwise anticompetitive, or else the anticompetitiveness of the defendants' purpose was obvious from the facts even without an express finding.[46] In *Dalmo Sales Co. v. Tysons Corner Regional Shopping Center*,[47] Judge Pratt of this District Court expressed a similar view of the group boycott per se cases in denying a motion for preliminary injunction in an antitrust case. Judge Pratt ruled that because the motivation underlying the defendant's action was not clearly anticompetitive, plaintiffs had not shown that they were likely to prevail on the merits of the group boycott claim.[48] The D.C. Circuit affirmed the decision.[49]

■■ In light of the Circuit Court cases and the authority in this Circuit, the Court believes the correct rule to be that the per se rule should be applied to concerted refusals to deal only if exclusionary purpose or effect and lack of legitimate competitive purpose are obvious from the nature of the combined action or are established by the evidence.[50] Consideration of all the evidence in this case, including the FCC's findings, fails to convince the Court that the per se rule should be applied here. Neither the underlying purpose nor the effect of the IMTS area policy appears unambiguously anticompetitive. In fact, as the FCC found, implementation of the policy in

43. See the discussion of the per se group boycott cases set forth in *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 186–87 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

44. See *Worthen Bank & Trust Co. v. National BankAmericard, Inc.*, 485 F.2d 119 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *Bridge Corp. of America v. American Contract Bridge League, Inc.*, 428 F.2d 1365 (9th Cir. 1970), *cert. denied*, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971); *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

45. *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963); see also *Northern Pac. RR v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

46. See *Worthen Bank & Trust Co. v. National BankAmericard, Inc.*, 485 F.2d 119, 127 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 187 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76–77 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

47. 308 F.Supp. 988 (D.D.C.1970).

48. *Id.* at 994.

49. *Dalmo Sales Co. v. Tysons Corner Regional Shopping Center*, 139 U.S.App.D.C. 22, 429 F.2d 206 (1970).

50. See *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

**162**

all but uncongested IMTS base station service areas was a technologically justifiable means of maintaining the efficiency of the IMTS systems.[51] Because of the existence of factual issues as to the competitive purpose and effect of the IMTS area policy, summary judgment must be denied as to this claim.

### The Otter Tail Theory

■ Plaintiffs base their second theory in support of summary judgment on *Otter Tail Power Co. v. United States*.[52] The analogy plaintiffs seek to draw between *Otter Tail* and the instant case must be rejected for several reasons. First, in *Otter Tail* the defendant concededly possessed monopoly power within the market of the scarce facility, i. e., power subtransmission lines.[53] In this case, however, an issue of fact exists as to whether AT&T possessed monopoly power within the mobile telephone service market in the relevant geographic areas. The alternative service evidently afforded by the RCC's precludes summary judgment on this issue. Second, in *Otter Tail* the lower court based its findings of monopolization and attempt to monopolize on the proof of intent and market power adduced during a full trial on the merits.[54] In this case, however, issues of material fact exist as to AT&T's intent and market power within the mobile telephone market, and as to whether Attache Phones and the vehicular phones supplied by AT&T's subsidiaries were competing products. Those issues of fact preclude summary judgment on plaintiffs' section two claim. The same factual issues bar summary judgment on this claim even if it is rephrased to state that the IMTS area policy constituted an unreasonable restraint of trade as a matter of law.

51. See *In re Referral of Chastain v. AT&T* 43 F.C.C.2d 1079, 1083 (1973).

52. 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

53. *Id.* at 370, 93 S.Ct. 1022.

54. *United States v. Otter Tail Power Co.,* 331 F.Supp. 54 (D.Minn.1971).